UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CALVIN CARTER | No. 19 CR 819<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

A detective assigned to a DEA task force signed an affidavit in support of a warrant to search a townhome. The affidavit contained errors and omissions, and a prosecutor submitted it to the magistrate judge without catching or correcting the errors. The judge approved the warrant and the search turned up incriminating evidence against defendant Calvin Carter. He moves to suppress the evidence and, at a minimum, requests a hearing to challenge the warrant under *Franks v. Delaware*, 438 U.S. 154 (1978).

In his affidavit, the detective explained that drug dealers often keep evidence related to their drug trafficking activities in their residences or places of business. [46-1] ¶¶ 7–8.[1] The DEA identified Calvin Carter as a suspected drug dealer with the nickname Buzzy. [46-1] ¶¶ 10–11. The detective said that an informant reported buying heroin from Buzzy for approximately one year before September 2019, and the informant identified a picture of Carter as Buzzy. [46-1] ¶¶ 10–11. The detective

---

[1] Bracketed numbers refer to entries on the district court docket and referenced page numbers are taken from the CM/ECF header placed at the top of filings.

also said that a March 2017 database search revealed that Carter listed a premises in Country Club Hills, Illinois, as his mailing address between January and September 2016. [46-1] ¶ 13.

On October 7, 10, and 16, 2019, DEA agents watched Carter enter and exit the attached garage to the townhome with the Country Club Hills address. [46-1] ¶¶ 21–22, 26–27, 33–36, 40–42. On one occasion, Carter opened the garage by entering a code on a panel affixed to the wood trim of the door. [46-1] ¶ 26. On other occasions, the garage door opened and closed when Carter was inside a car near the door. [46-1] ¶¶ 21–22, 27, 33, 35. While under surveillance on October 7 and 16, Carter drove a car out of the garage, sold heroin to the informant, and drove the car back into the garage. [46-1] ¶¶ 21–25, 40–43. On October 10, agents saw Carter walk out of the garage, get into a car, drive to a parking lot and stop next to another car. [46-1] ¶¶ 27–28. An object was tossed between the two cars, Carter drove back to the townhome, the garage door opened, and Carter drove into the garage. [46-1] ¶¶ 28–29. The driver of the other car told investigators that she tried to toss $150 into Buzzy's car as payment for a drug debt. [46-1] ¶¶ 31–32. In his affidavit, the detective said that Carter exercised control over the townhome by accessing it through the garage, and that agents observed that Carter could operate the garage door remotely or with an opener. [46-1] ¶ 44.

The magistrate judge authorized a search of the townhome—a two-story dwelling with an attached garage—for evidence of violations of federal drug laws. [46-1] at 27–29.

The detective's affidavit is wrong about at least two things, and Carter argues that it's wrong about two more. First, there was no March 2017 database query that revealed that Carter listed the townhome as his mailing address. There were two database queries in May 2017 that linked Carter to the address, but not because Carter listed it as a mailing address. [46] at 8 n.2, 20–21.[2] Second, the affidavit says agents observed Carter at Crawford Avenue in Flossmoor on October 16, but that part of the road was in Country Club Hills. [46] at 7 n.3. (The towns border one another at Pulaski Road, which is also called Crawford Avenue around 188th Street.) Third, the affidavit reports that the informant claimed to buy heroin from Buzzy for approximately one year before September 2019 (i.e., September 2018 to September 2019). Carter says that can't be true because Carter was in prison from January to December 2018 (so he could not have been selling heroin to the informant in September, October, November, or December 2018). The government offers no contemporaneous documentation of the informant's statement. Fourth, the affidavit

---

[2] At oral argument on the motion, government counsel said that the association between Carter and the address in one database (CLEAR, a Thomson Reuters product used by law enforcement) may have come from a moving company. The report in the second database, a law enforcement database, came from a detective entering that information into the database. The government has no concrete explanation for how or why law enforcement personnel made the connection between Carter and the townhome in that database in 2017.

says that agents observed Carter operate the garage door remotely or with an opener, but at most (other than the one time they saw him type a code into the door panel) the agents saw Carter near the door when it opened and closed—they never directly saw him operating the door with a remote device.

The affidavit omits something too. While it says a database linked Carter to the townhome in 2016, it fails to mention that databases linked Carter to over a dozen different addresses over the years, including many references to a single residential address in Chicago. [46] at 19; [38] at 10 n.5. Carter suspects that there is another omission: agents were investigating Carter for gun crimes, not drug dealing, and may have used other undisclosed investigative techniques. [38] at 13 n.6, 14; [57] at 5 n.1.

Although not an omission in the sense that the information exists but was not disclosed, the affidavit mentions no observations of Carter staying at the Country Club Hills townhome overnight or any surveillance of him between October 16 and October 25, when the detective obtained the warrant. There is no mention of whether anyone else was seen at the townhome or if someone else was associated with the address closer in time to the October 2019 drug deals.

"The ability of the neutral and detached magistrate to determine probable cause depends on the accuracy of the information the police submit." *United States v. Clark*, 935 F.3d 558, 563 (7th Cir. 2019). False, material information presented deliberately or recklessly invalidates the warrant. *Id.* (citing *United States v. McMurtrey*, 704 F.3d 502, 508 (7th Cir. 2013) and *Franks*, 438 U.S. at 155–56)). To

4

obtain a *Franks* hearing to invalidate a warrant, a defendant "must make a substantial preliminary showing (1) that the warrant application contained a material falsity or omission that would alter the issuing judge's probable cause determination, and (2) that the affiant included the material falsity or omitted information intentionally or with a reckless disregard for the truth." *Id.*

The false statement about the March 2017 database search was immaterial to the probable-cause finding. The detective emphasized the connection between a drug dealer's residence and evidence of drug trafficking, so a reference to Carter listing a mailing address was relevant. But even assuming the detective intentionally stretched the database hit to play it up as a residential connection, he did not go so far as to conceal its limited usefulness. The statement truthfully reported that the connection between Carter and the address dated to 2016—years before the requested search. The information was stale, so its contribution to the probable-cause assessment was minimal, and the distinction between Carter listing it and someone else attributing the address to Carter in 2016 was, in 2019, entirely immaterial. Similarly, even if agents planted the connection between Carter and the townhome into a law enforcement database, *see* [57] at 5, that was done in 2017 and was too old to influence the probable-cause assessment in October 2019. And whether there were one or two database queries in March or May 2017 shed no light on the probable cause to believe there would be evidence in the townhome in October 2019.

5

The surveillance of Carter entering and exiting the garage when conducting drug deals was more than sufficient to give the magistrate judge probable cause to issue the warrant. Although the agents didn't see Carter sleeping there overnight and the historical record tying him to that location was flimsy, his ease of access and immediate use of the property during drug transactions suggested in a practical, common-sense way that Carter used the townhome (an obviously residential property, [46-1] at 27) as a residence during the drug deals. Those observations and the agent's experience were enough to tie the premises to a fair probability that contraband or evidence of a crime would be found there. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). The surveillance and controlled buys established Carter's drug trafficking activities and his immediate exit and entry from the premises before and after the deals tied the townhome to his drug dealing. Although Carter describes the evidence as simply short visits into the garage, the repetitive connection between the garage (attached to the townhome) and Carter's drug deals gave the magistrate judge "a substantial basis for concluding that a search would uncover evidence of wrongdoing." *United States v. Rees*, 957 F.3d 761, 765 (7th Cir. 2020) (quoting *Gates*, 462 U.S. at 236) (cleaned up). An accurate statement of the database query from 2017 would not have changed the determination, and Carter has not made any showing that the false information or omissions affected the reasonableness of the magistrate

6

judge's decision.[3] Carter does not suggest that his connection to a Chicago address undermined the surveillance agents' observations that he was using the Country Club Hills townhome during his October 2019 drug dealing.[4] Because the garage was attached to the townhome, it was reasonable to infer that the entire premises was accessible to and used by Carter in connection with the drug sales.

Although the informant's statement that they regularly bought drugs from Buzzy for about one year is impeached by Carter's record of imprisonment, it is not materially impeached. The informant's statement was reported to be approximate and was wrong about a matter of months. What was important to the judge was not Carter's frequency of contact with the informant in 2018 but whether the townhome might have had evidence of drug trafficking in October 2019. The informant's statement provided the magistrate judge with some context for the controlled buys that took place in October, and explained why the agents believed Carter had some connection to the area around Country Club Hills. Ultimately, even if the informant

---

[3] The government pointed out its own error about the distinction between Flossmoor and Country Club Hills. Carter does not argue that the error was material or an intentional or reckless falsehood.

[4] Carter's connection to the address in Chicago was also stale. *See* [40] at 3 (listing contact with the Chicago address from 2008 to 2016). Telling the magistrate judge about it would not have affected the evaluation of the October 2019 surveillance that placed Carter at the townhome when he conducted drug deals. If there were evidence of other surveillance that put Carter at a different residence in October 2019, that would undermine the suggestion that Carter was using the townhome as a residence, but it would not undermine the fair probability that the townhome was a location tied to drug dealing and a place where evidence of drug dealing would be found. Carter entered and exited the townhome during his drug deals and that is enough to suggest that he kept inventory or paraphernalia for dealing there. In any event, Carter does not suggest that there is evidence of any exculpatory surveillance.

manufactured the entirety of their past relationship with Carter, the controlled buys and surveillance tied Carter's drug dealing to the townhome. The October 10 deal did not involve the informant at all and provided significant corroboration of the controlled buys. The agency should have documented the informant's statement and best practices would direct the detective and prosecutor to disclose to the magistrate judge the evidence known to the prosecution team that impeached the informant. But the precise timing of the informant's interaction with Carter in 2018 was immaterial, and there is no evidence to suggest that the detective believed the informant was being untruthful about buying drugs from Buzzy.

Read literally, the detective's statement that agents observed Carter controlling the garage door was an overstatement. Again, the detective and the prosecutor should have been more careful when presenting facts to a court, but this statement was consistent with the specific observations reported in the affidavit. Carter points out that the detective omitted some details, namely that Carter was seen using his phone around the time the garage door opened. According to Carter, the video surveillance depicts him as a visitor, not a resident of the townhome. But agents saw the door opening and closing while Carter was nearby, suggesting that he had some ability—directly or indirectly—to open the door. He drove cars into and out of the garage (a parking spot usually reserved for an occupant of a home, not a visitor). The agents' inference of control was not unreasonable, even if Carter draws a

8

different one. The choice of wording was neither materially false nor indicative of a reckless disregard for the truth.

If the agents were more interested in gun crimes than drug dealing, omitting that motive was irrelevant to the magistrate judge's decision. The affidavit established probable cause to believe that Carter was involved in drug dealing from the townhome and that was the only issue for the magistrate judge to decide. The agents' subjective motives did not bear on the objective question presented in the warrant and the same goes for Carter's suspicion that other investigative techniques were used against him—that speculation is unsupported and immaterial because it does not undermine the evidence tying together Carter, drug deals, and the townhome.

Perhaps the detective's motives (a hidden gun trafficking investigation), his failure to tell the magistrate judge everything he knew about addresses connected to Carter, and his failure to detail the surveillance that Carter interprets as visiting not residing at the townhome suggests an intent to deceive the judge or a lack of good faith toward the process. That is the import of Carter's argument, but nothing in Carter's preliminary showing supports it. The affidavit disclosed the stale dates for the database search and its results (a 2017 database query returned information from 2016). It also disclosed to the judge that the detective was not including everything he knew about the investigation, but only those facts the detective thought necessary to decide the probable-cause question. [46-1] at 3–4, ¶ 6. The errors were avoidable

but not material and nothing about Carter's suspicions that more was going on suggests an intent to deceive the judge.

Carter has not made the requisite preliminary showing to justify a *Franks* hearing, and has not identified a material falsity or omission that undermines the compelling evidence tying the townhome to drug evidence. The magistrate judge had more than enough to conclude that the warrant should issue.

Finally, the exclusionary rule does not apply "if the good-faith exception applies—that is, if the officers who executed the warrants relied, in objective good faith, on the magistrate's probable-cause decision." *Rees*, 957 F.3d at 771 (citing *United States v. Leon*, 468 U.S. 897, 922–24 (1984)). The detective chose to get a warrant and that suggests good faith on his part. *Id.* So to overcome this presumption of good faith, Carter must show that: (1) the detective intentionally or recklessly misled the judge with false information; (2) the judge abandoned the judicial role; (3) the affidavit was bare boned, "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant was so facially deficient in particularizing its scope that the officers could not reasonably presume it was valid. *Id.* (citations omitted). The last three options are nonstarters here. There is no suggestion that the magistrate judge abandoned her role, the affidavit was not bare boned—it contained detailed descriptions of the surveillance and controlled buys that supported a showing of probable cause, and there is no argument that the warrant was not particularized—it spelled out the premises to be searched and the

10

items to be seized. That leaves the argument that the detective intentionally or recklessly misled the judge with false information about the investigation, the database query results, and the surveillance. But as discussed above, Carter's showing has at most demonstrated immaterial errors. The controlled buys and surveillance placing Carter at the home before and after his deals established probable cause to believe that the townhome contained evidence of Carter's drug-dealing activities. The magistrate judge reasonably approved the warrant and the executing agents could rely in good faith on that decision.

The detective and the prosecutor could and should have done a better job—testifying under oath in support of a warrant to search a home is no time for carelessness. But in the end, Carter has not made the requisite preliminary showing to justify a *Franks* hearing, the detective did not act in reckless disregard for the truth over material facts, the magistrate judge had probable cause to issue the warrant notwithstanding the mistakes and omissions, and agents could rely in good faith on the warrant. Carter's motions to suppress and for a *Franks* hearing, [38] [40], are denied.

ENTER:

Date: September 9, 2020

Manish S. Shah
United States District Judge